# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**CYNTHIA EDMONSTON,**

**Plaintiff,**

**-vs-**                                                    **Case No.  6:04-cv-566-Orl-28DAB**

**COMMISSIONER OF SOCIAL
SECURITY,**

**Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

 This cause came on for consideration without oral argument on review of Defendant's denial of Plaintiff's application for Social Security benefits.  For the reasons set forth herein, it si **respectfully recommended** that the decision of the Commissioner be **AFFIRMED.**

### PROCEDURAL HISTORY

 On January 30, 2002, Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C.§ 423 (R. 112-14).  The claim was denied at the initial level and on reconsideration.  Plaintiff requested and received an administrative hearing, before an Administrative Law Judge ("the ALJ") (R. 38-88).   The ALJ issued an unfavorable decision on November 4, 2003 (R. 18-34), and Plaintiff requested Appeals Council review (R. 7).  The Appeals Council denied the request, making the ALJ's decision the final decision of the Commissioner (R. 4-6).  This action timely followed.

### NATURE OF DISABILITY CLAIM

Plaintiff claims to be disabled as of March 1, 2001, due to chronic fatigue immune syndrome, fibromyalgia, arthritis, depression, anxiety disorder, high blood pressure, hyperlipids, hypercholesterol, irritable colon syndrome, irritable bladder syndrome, and heart palpitations (R. 119).

### Summary of Evidence before the ALJ

At the time of the alleged onset, Plaintiff was forty-two years of age, with two years of college, and past relevant employment as a registered nurse and a licensed practical nurse (R. 49, 120, 132-134).

Although Plaintiff alleges an onset date of March 1, 2001, she submitted medical records from November 1999.  On November 10, 1999, Plaintiff presented to psychiatrist Luis Allen for a psychiatric evaluation, on referral from her primary physician (R. 336-40).  On mental status examination, no abnormalities were noted, save for depressed mood (R. 337).  Diagnoses included major depressive disorder, without psychotic features, and mood disorder secondary to medical condition with depressive like features.  Her GAF was 45, and plan was to place her on antidepressants (R. 340).

Plaintiff returned to Dr. Allen on December 1, 1999, and noted that she was doing better with medication.  Her mood was improved and she was less anxious (R. 335).  She saw Dr. Allen in January, and continued improvement was noted (R. 334).  In March, Plaintiff had improving mood and sleep, but difficulty with short term memory (R. 333).  It was noted, however, that she had not taken the prescribed medication.  *Id.*  On return visit in April, Plaintiff reported some problems with attention and concentration, but stated that she was able to carry out her tasks at work, although it takes a while, at times (R. 332).  She denied a depressed mood.

On return visit May 17, 2000, Plaintiff reported that she had decreased her dosage of medication and was doing better (R. 331).  Her job performance had improved and she was able to finish her tasks on time.  *Id.*

On July 11, 2000, Plaintiff presented to arthritis specialist Dr. Javaid Sheikh, complaining of a two year history of diffuse arthralgias and myalgias (R. 181).  Physical examination revealed no abnormalities, and Plaintiff had no evidence of swelling or synovitis in any joint, and had full range of motion in elbows, shoulders, knees, hips and cervical and lumbar spine (R. 182).  Lab results and x-rays were unremarkable and negative for disease (R. 180).  Dr. Sheikh noted that "there is no clinical evidence of active inflammatory arthritis or connective tissue disease." (R. 82).  Impression was most likely fibromyalgia associated with anxiety and depression.

Plaintiff returned to her psychiatrist on July 26, 2000, and described improvement (R. 330).  Dr. Allen noted that patient feels "overall things are falling into place."  Plaintiff next returned to Dr. Allen on November 6, 2000, and reported that she was doing better, having changed her work schedule to weekdays, but noted a financial strain at home (R. 329).  On return visit January 2001, Plaintiff reported that she was not doing well and was experiencing a variety of stressors (R. 328).[1]  She also noted that she had been unable to work and had not been taking her medications.  Plan was to restart the medications, and compliance was emphasized.

Plaintiff underwent evaluation with a cardiologist in January 2001, for chest pain (R. 187-88).  Physical examination showed clear lungs, and her heart had a regular rate and rhythm.  An ECG indicated sinus rhythm with nonspecific T wave abnormalities, but her exercise test and

---

[1]Plaintiff identified the stressors as having to file bankruptcy, her husband's illness and an inability to adopt a child (R. 328).

echocardiogram were essentially normal (R. 186, 188).  The assessment was atypical chest pain, narrow complex tachycardia, chronic fatigue syndrome and obesity.  Medication and physical activity were prescribed (R. 188).  On return visit in February, it was noted that her tachycardia "appears to be controlled with beta blocker, with no evidence of structural heart disease on echocardiogram." (R. 184).  Plaintiff was assessed to be at Functional Capacity I: "Patient with Disease but without resulting limitation of physical activity." (R. 184).

According to her reports, Plaintiff stopped working in March 2001.

Plaintiff returned to her psychiatrist May 7, 2001, and reported that she was doing well since she had stopped working (R. 327).  Plaintiff returned in June 2001, and Dr. Allen noted that her depression was improving, with no troubling symptoms present (R. 326).  Plan was to continue the medications.  Plaintiff did not return to Dr. Allen until April 2002 (R. 325).

On June 25, 2001, Plaintiff presented to Patricia Maclay, M.D., for fibromyalgia complaints (R. 303-06).  On physical examination, Plaintiff had 18/18 tender points, 4+ paracervical, paralumbar muscle spasm, and hypersensitivity to pin prick in the upper arms and mid calf to toes (R. 305).  There was no evidence of motor weakness, and Plaintiff was psychologically oriented with no overt depression symptoms.  *Id.*  Impression included *inter alia* "autonomic nervous system dysfunction manifested as fibromyalgia," peripheral neuropathy, and reactional depression appropriate.  *Id.*  Plan included recommended "reading, exercises, etc." (R. 306).  Based on this one visit, Dr. Maclay gave Plaintiff "a permit to remain off the job" for an "indefinite period" due to disability.  *Id.  See* R. 368.

On return visit on July 20, 2001, Dr. Maclay noted that Plaintiff's physical condition was unchanged, and that she had lower quadrant pain with significant paracervical, paralumbar muscle spasms (R. 302).  Plan was to address her vitamin B-12 deficiency with food and supplements and

Plaintiff was referred to another physician  "to take over the medical aspects of this workup." (R. 301).  Trazodone was prescribed.

On August 13, 2001, Dr. Maclay opined that Plaintiff was disabled due to her fibromyalgia, and would continue to be disabled for at least six months (R. 367).

On October 18, 2001, Plaintiff presented at the emergency room complaining of back pain radiating into her left buttock and left leg  (R 217).  She was discharged from the emergency room with the diagnosis of acute sciatica and low back pain and directed to follow up with an orthopaedic evaluation (R. 212).

The next day, October 19, 2001, Plaintiff returned to Dr. Maclay, but no physical examination was done (R. 300).

Plaintiff saw an orthopedic surgeon, Dr. Jose Amundaray, on October 23, 2001 (R. 221). Physical examination showed a slow and cautious gait, with normal station.  Minimal point tenderness was present with no spasms and minimal decrease in range of motion in the neck and shoulders. Physical examination of the upper extremies was unremarkable.  Plaintiff had lumbar point tenderness, and decreased lumbar range of motion, and a positive left straight leg raising. Examination of the lower extremities, including neurological function, was unremarkable.  (R. 221-22).  X-rays were normal.  Assessment was lumbar strain and left lower extremity sciatica.  An MRI was ordered.

On follow-up visit November 1, 2001, Plaintiff stated that she was doing much better (R. 219). Physical examination showed improvement, as well, with negative straight let raising bilaterally.  The MRI revealed no obvious disc disease and only mild facet sclerosis.  *Id.*  Dr. Amundaray felt the strain was "resolving" and recommended that Plaintiff "try to stay as active as possible" (R. 219-20).

Plaintiff returned to Dr. Maclay in February 2002, and reported that she had gone off her Klonopin and now feels that she can think and function much better (R. 299).

On February 26, 2002, Plaintiff was evaluated by a mental health counselor at the Florida Hospital Employee Assistance Program (R. 248).  Plaintiff was assessed with adjustment disorder with mixed anxiety and depressed mood, and her GAF was assessed at 80 (R. 251).

On April 9, 2002, Plaintiff returned to her psychiatrist after a 10 month absence (R. 325).  Her medication was increased, and counseling was recommended.  Plaintiff returned on July 9, 2002, complaining of some episodes of irritability and fluctuation of mood (R. 324).  Topamax was added.

Plaintiff was evaluated by psychologist Leigh Rosenberg, at the request of the Commissioner, on July 21, 2002 (R. 270).  Following testing, diagnostic impression was dysthymia, moderate severity, and pain disorder (R. 273).  Functionally, Dr. Rosenberg felt Plaintiff had no deficit in ability to independently perform personal hygiene; a mild deficit with attention/concentration to tasks; no primary deficit with ability to follow directions; mild deficit in interpersonal skills; a moderate to severe fatigue based deficit on physical abilities; and no primary deficit in ability to manage funds. *Id.*

On July 14, 2002, Plaintiff presented at the office of neurologist, Dr. Nieves-Quinones, for evaluation of various complaints (R. 313).  After the evaluation, the doctor concluded that the memory loss was most likely related to depression and anxiety and was more of a concentration problem (R. 314).

On August 19, 2002, Plaintiff returned to Dr. Allen and reported she was doing well (R. 323).  On September 18, 2002, she returned feeling anxious and disappointed regarding her Worker's Compensation determination and felt she was being treated unjustly (R. 322).

Plaintiff returned on September 23, 2002, to neurologist Dr. Nieves-Quinones for follow-up of her complaints of memory loss, chronic headaches, visual disturbances, panic attacks and fibromyalgia (R 312).   An MRI of the brain was unremarkable.   Examination indicated features of peripheral polyneuropathy, and an EMG nerve conduction test was ordered.  *(Id.)* This test was performed on November 4, 2002, revealing an abnormal study consistent with probable, predominantly sensory peripheral neuropathy (R. 307).  Topamax was ordered.  No restrictions were placed on Plaintiff by this physician.

On what appears to be October 14, 2002,[2] Dr. Maclay completed a functional capacity questionnaire regarding Plaintiff (R. 295-98).  Dr. Maclay indicated that Plaintiff suffered from fibromyalgia, peripheral neuropathy, abnormally elevated liver functioning tests, hypertension, and obesity.   It was noted that Plaintiff had multiple tender points, numbness and tingling, muscle weakness, anxiety, panic attacks and depression.  Dr. Maclay opined that Plaintiff could rarely lift up to ten pounds and could only sit and stand/walk thirty minutes to one hour combined in an eight-hour day (R. 297).  In her opinion, Plaintiff could not stand more than 5 minutes at a time, and could not sit more than 10 minutes.  Dr. Maclay stated that Plaintiff must use a cane or other assistive device to occasionally stand or walk, was incapable of even a "low stress" job, and would likely be absent from work more than 30 [!] days per month (R. 296-98) [emphasis added].

On November 18, 2002, Plaintiff returned to Dr. Allen, reporting some episodes of feeling depressed, but overall noticeably improved (R. 375).  Plaintiff was alert, fully oriented and indicated no feelings of helplessness or hopelessness.  Dr. Allen described her as "goal and future oriented."

---

[2]The date on the note is illegible and largely irrelevant.

(R. 375).  It was noted that Plaintiff had not complied with the recommendation of Dr. Allen and Plaintiff's neurologist to increase her medication.  Plan was to follow up in two months.

Three days later, on November 21, 2002, Dr. Allen completed a mental impairment questionnaire indicating that Plaintiff's condition was severe and that she had a current global assessment of functioning of forty-five (R. 318).  Dr. Allen noted that Ms. Edmonston had experienced appetite disturbance with weight change, decreased energy, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, recurrent and intrusive recollections of a traumatic experience, and persistent disturbances of mood or affect (R. 319).  Dr. Allen opined that Plaintiff had moderate difficulties in maintaining social functioning, marked deficiencies of concentration, persistence or pace, and she had had one to two episodes of decompensation within a twelve month period.  Dr. Allen opined that Plaintiff was not a malingerer, and that she could be expected to be absent from work for more than four days per month due to her impairment (R. 320-21).

Plaintiff returned on January 6, 2003, to neurologist Dr. Nieves-Quinones for follow-up (R. 369).  Plaintiff reported some improvement of the pain, but numbness and tingling continued.  Dr. Nieves-Quinones noted that Plaintiff had not complied with his recommendation for laboratory evaluation.  Physical examination showed no new cranial nerve, motor or gait abnormalities, and assessment was peripheral polyneuropathy, unclear etiology, and chronic radiculopathy, absent acute or recent denervation.  *Id.*

On January 13, 2003, Plaintiff returned to Dr. Allen and noted that she would not be able to return as her insurance was being terminated (R. 374).  Plaintiff spoke "about the difficulty in dealings [sic] with obtaining disability and also talked about her low energy level, her lack of

motivation at times, coupled with some periods of irritability." *Id.* Plaintiff was noted to be "very much future oriented" and "making plans on what she can do with disability." Plaintiff advised that she would be seeking treatment at Lakeside Alternatives.

There are no records indicating that Plaintiff presented to or was treated at Lakeside Alternatives.

On June 18, 2003, Plaintiff returned to Dr. Allen for the first time since January, reporting that she now has insurance (R. 373). She reported that the medications were helping, but that she could not afford them. Things were "not going well" financially for her family, but Plaintiff stated that she was able to go back to church, which was "very helpful and provide[d] her with hope."

On June 19, 2003, Plaintiff returned to Dr. Maclay after not being seen there "for quite some time." (R. 376). Dr. Maclay noted that Plaintiff's stressors were significant and her "FM flaring." It was noted that her social security claim was denied. Plan included a workup, and Darvocet was prescribed.

On July 23, 2003, Plaintiff returned to Dr. Maclay, asserting that all of her symptoms were worse, especially cognitive and memory (R. 386). It was noted that she had gone through extreme financial distress, and her social security disability hearing date and time were noted. *Id.* Physical examination was "unchanged. All 18/18 tender points, four quadrant pain." Impression was severe FM, active, discogenic disease, active and peripheral neuropathy, unknown etiology. Dr. Maclay noted that Plaintiff was "completely and totally disabled for any and all types of employment, due to fibromyalgia." A letter to this effect was given on August 6, 2003 (R. 385).

On August 13, 2003, Plaintiff returned to Dr. Allen, reporting that she was back on her medication and doing better (R. 388).  No helplessness or hopelessness was reported; she was fully oriented and had "fairly good attention and concentration."  Plaintiff was responsive to the medication and "is not interested in any additional intervention at this point."  Plaintiff reported that she had a meeting scheduled with her attorney and a disability hearing at the end of the month.  *Id.*

The record includes evaluations by state agency physicians and psychologists.  On April 16, 2002, a state agency physician found that Plaintiff could sit, stand, and walk six hours during an eight hour workday, occasionally lift 20 pounds and could frequently lift 10 (R. 252-59). These restrictions were also found on January 30, 2003, by another state agency physician, who added occasional restrictions working in temperature extremes, at unprotected heights, and around moving machinery (R. 30, 359-66). On August 16, 2002, a non-treating, non-examining psychologist opined that Plaintiff had no limitations in understanding, remembering, and carrying out simple instructions; and moderate limitations in the ability to understand, remember and carry out detailed instructions and maintain concentration for extended periods of time; as well as moderate limitations in the ability to complete a normal workday without interruption and interact appropriately with the public (R. 292). (R. 291; 276-94).  On December 3, 2002, another psychologist found that the Plaintiff had moderate limitations in sustaining concentration and carrying out detailed instructions; no limitations in her ability to interact appropriately with the public, supervisors or coworkers; and a moderate limitation in her ability to respond appropriately to changes in the work setting (R. 341-56).

Plaintiff appeared and testified about her pain and limitations at her administrative hearing (R. 38, *et seq.*).  She stated that she never sleeps more than three hours (R. 48), but later noted that she sleeps during the day (R. 62).  She can drive (R. 55) and sometimes uses a computer at home (R. 54).

 She stated that she thinks the medicine is helping her (R. 60) and she is not as depressed as she was (R. 61).  She sometimes takes her son to school and back, if she is not fatigued (R. 63), and she likes to go to church (R. 65).  She testified that she could sit or stand for 10 minutes comfortably, and could walk around the block on a good day (R. 67).  She stated that she has to have her husband turn her over at night, and has pain "everywhere." (R.70).

A vocational expert ("VE") also appeared and testified (R. 74).  The ALJ initially asked the VE to consider an individual of Plaintiff's age, education, and past work experience who retains the RFC for no more than light work with the ability to sit, stand, and walk six hours during an eight hour workday, with occasional limitations of work exposure in temperature extremes, at unprotected heights, and around moving machinery (R. 76). Additionally, Plaintiff had mild restrictions of activities of daily living, moderate limitations in social functioning, and moderate deficiencies in concentration, persistence or pace (R. 32, 76-77, 79-81).  The VE opined that such a person would be able to perform work as a utilization review coordination specialist and care coordinator (R. 79-80). The VE testified that these jobs are not yet listed in the Dictionary of Occupational Titles (DOT), but are sedentary positions available to nurses in the area of telephonic nurse care managers and coordinators that work in insurance company offices (R. 80).  The VE testified that these are relatively new skilled jobs that were created as a result of managed care, which utilize registered nurse experience, and that the jobs exist in very significant numbers in the national economy (R. 81).

The VE also testified that if Dr. Allen's findings of marked limitations in her mental status were applied, these jobs could not be performed by such a person (R. 82).

The record also includes reports from Plaintiff and her mother regarding Plaintiff's daily activities, which include some meal preparation, shopping, and occasional housework (R. 144-45; 154-55).

After summarizing the evidence, the ALJ found that Plaintiff had fibromyalgia, situational depression secondary to financial difficulties, and sensory peripheral polyneuropathy; severe impairments but not severe enough to meet a Listing (R. 28). Plaintiff retained the residual functional capacity ("RFC") to perform light work with some nonexertional limitations, including mild restrictions of activities of daily living, moderate restrictions in social functioning and moderate deficiencies in concentration, persistence or pace. (R. 31, 33-34, Finding No. 7). Utilizing the Medical-Vocational Guidelines (the grids) as a framework, along with the VE testimony, the ALJ found that Plaintiff was not disabled (R. 32-34, Findings No. 13, 14).

### STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir.2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" 357 F.3d at 1240 n. 8 (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

### ISSUES AND ANALYSIS

Plaintiff raises the following related issues in her brief: 1) whether the ALJ erred in determining that the claimant has the residual functional capacity to perform light work when the claimant's treating physician concluded that the claimant would be precluded from performing even sedentary, low stress work; 2) whether the ALJ properly relied on the testimony of the vocational expert; 3) whether the ALJ Judge properly evaluated Plaintiff's allegations of pain; and 4) whether the ALJ erred in finding that the claimant was "not fully credible" regarding her allegations of pain and limitations.  We address each issue in turn.

**Treating Physicians**

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not

inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements.)

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

Here, Plaintiff contends that the conclusions of her treating physician, Dr. Maclay, were entitled to great weight and should not have been discounted by the ALJ.  In his determination, the ALJ rejected Dr. Maclay's opinion of total disability as being "very extreme," not supported by her own objective findings, inconsistent with the minimal findings of the cardiologist, the orthopedist, the arthritis specialist, and the state agency physicians, and inconsistent with Plaintiff's own reports of function (R. 30).  The determination lists numerous examples of the contradictions between the record

-14-

evidence and Dr. Maclay's conclusion of complete incapacitation (R. 30). The Court finds that the ALJ's findings regarding Dr. Maclay's opinions are supported by the substantial record evidence cited by the ALJ.

As noted above, Dr. Maclay found Plaintiff to be disabled indefinitely on her very first visit, *prior* to any review of her medical records and prior to any testing (R. 306). Moreover, Dr. Maclay opined that Plaintiff would need to use a cane to ambulate, could not stand for more than five minutes, and was unable to work for a single day out of the month. These conclusions are, indeed, extreme and not supported by the objective evidence, nor Plaintiff's own descriptions of her limitations.[3]

Plaintiff attempts to bolster Dr. Maclay's opinions by noting the lengthy time of each office visit. The Court does not find this persuasive. As pointed out by the Commissioner, the number of total visits over a several year period were relatively few, and, as set forth in the notes, the majority of time was spent in "counseling and education." In fact, in one visit, no physical examination was performed due to the number of questions Plaintiff had regarding a silicone breast implant legal situation (R. 300).[4] The ALJ's discrediting of Dr. Maclay's opinion is adequately supported and should therefore not be disturbed.

Having adequately discredited the opinion of Dr. Maclay, the ALJ looked to the other treating, examining, and non-examining sources to formulate a RFC. Specifically, the ALJ relied upon the opinions of the non-examining state agency sources, noting that those opinions were supported by the clinical and laboratory findings of record. As the treating physician's opinions were discredited, the

---

[3]No physician, including Dr. Maclay, has prescribed a cane for Plaintiff and Plaintiff's description of her activities reveal that she is upright for more than five minutes at a time.

[4]Indeed, the lengthy counseling and education sessions with Dr. Maclay belie Maclay's opinion that Plaintiff could neither stand nor sit for more than 10 minutes.

ALJ did not err in relying on the state agency physician's opinions, which were based on the findings of the other doctors of record.

### Hypothetical Question

Plaintiff next contends that the hypothetical presented to the VE "did not adequately reflect the limitations of the claimant." (Brief at 12).  The case law in this circuit requires that the ALJ employ hypothetical questions which are accurate and supportable on the record and which include all limitations or restrictions of the particular claimant. *Pendley v. Heckler*, 767 F.2d 1561 (11th Cir. 1985).  Where the hypothetical employed with the vocational expert does not fully assume all of a claimant's limitations, the decision of the ALJ, based significantly on the expert testimony, is unsupported by substantial evidence. *Id*. At 1561 (quoting *Brenam v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980)).

Here, Plaintiff argues that the hypothetical used was incomplete because it did not include Dr. Maclay's limitation against all work, even low stress, sedentary jobs, and Dr. Allen's limitations of marked deficiencies in concentration, persistence or pace and moderate difficulties in maintaining social functioning.

As set forth above, the ALJ did not credit Dr. Maclay's opinion, and that conclusion is adequately supported.  As such, it was not error to exclude Dr. Maclay's restrictions in the hypothetical.  As for Dr. Allen, the ALJ found that Plaintiff had situational depression which was secondary to financial difficulties (R. 28), but that she did not have marked restrictions in activities of daily living or social functioning; thus, implicitly discrediting that portion of Dr. Allen's opinion. As set forth in Issue One, above, the Court must evaluate whether the ALJ's conclusion to discredit a portion of Dr. Allen's opinion is adequately supported.  We hold it is.

-16-

While the ALJ did note Dr. Allen's November 2002 findings (R. 26), he also noted that the consulting psychologist found only mild attention and concentration difficulties when Plaintiff was tested in July 2002 (R. 28), and Dr. Allen's contemporaneous November 2002 treatment notes, as well as his more recent treatment notes, indicate that she was much improved on her medication.  *Id.* Indeed, in November 2002, Dr. Allen did not note any marked difficulties in his treatment notes, which described Plaintiff as being alert, fully oriented, with no feelings of helplessness or hopelessness, and "goal and future oriented." The ALJ considered the opinions of the state agency psychologists, the consulting psychologist and test results, the progress notes of Dr. Allen (including the fact that Plaintiff went for almost a year without seeing Dr. Allen and that there were no episodes of hospitalizations or emergency treatment due to decompensation), Plaintiff's own reports of functioning, as well as the report of Plaintiff's mother, and concluded that Plaintiff had mild restrictions of daily living and moderate limitations in social functioning and concentration, persistence or pace (R. 29-30).  These limitations were included in the hypothetical presented to the VE.  The Court finds that these conclusions are supported by the substantial evidence set forth above, and therefore, the ALJ did not err in crafting the hypothetical presented to the VE.[5]

**Pain and Credibility**

Pain is a non-exertional impairment.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and

---

[5]The Court notes that Plaintiff's GAF was assessed at 80 on February 26, 2002 ( R. 251).

laboratory findings show medical impairments which reasonably could be expected to produce the

pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either
> (2) objective medical evidence that confirms the severity of the alleged pain arising
> from that condition or (3) that the objectively determined medical condition is of such
> a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone

can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,

957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself,

conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate

specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.

*Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated

reasons must be based on substantial evidence).   A reviewing court will not disturb a clearly

articulated credibility finding with substantial supporting evidence in the record.  As a matter of law,

the failure to articulate the reasons for discrediting subjective pain testimony requires that the

testimony be accepted as true.  *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545

(11th Cir. 1988).

Here, Plaintiff asserts that the ALJ erred in evaluating Plaintiff's pain, primarily due to the

ALJ's "failure to understand the nature of Plaintiff's disease," noting *Stewart v. Apfel,* No. 99-6132,

2000 U.S.App. LEXIS 33214 (11th Cir. Dec. 20, 2000), an unpublished (and thus, not binding)

opinion (Brief at 16).  According to Plaintiff, she met the pain standard because she has fibromyalgia

(step one) and Dr. Maclay has confirmed that it is severe enough to meet step three.  The Court is not persuaded by this argument.

The ALJ acknowledged that Plaintiff had the impairment of fibromyalgia, but rejected Dr. Maclay's conclusions as to the severity of the impairment, and found that Plaintiff is more functional than she alleges.  As shown above, it was not error to discredit Dr. Maclay's opinion.  Absent that opinion, the ALJ looked to the record to find objective evidence confirming the severity of pain and limitations, or evidence that the condition itself if so severe that it can be reasonably expected to cause the pain and limitations.  The ALJ found neither to be the case.  The ALJ noted that the fibromyalgia does cause pain and impairment, but noted the mostly normal objective reports on Plaintiff's level of functioning (including motor strength, range of motion, and sensory deficits), as well as Plaintiff's own reports that the medications were helping her pain (R. 30-31).  The ALJ also noted Plaintiff's self-reported level of functioning: that she drives, uses the computer, picks up her son from school and does some cooking, shopping and light housekeeping.  She goes to church and takes care of her personal needs.  These activities were deemed to be inconsistent with the complete incapacitation alleged by Dr. Maclay.

The ability to do everyday activities does not preclude a finding of disability.  By the same token, however, the mere diagnosis of fibromyalgia does not, by itself, automatically establish one.  *See Moore v. Barnhart*, 405 F.3d 1208, 2005 WL 831674 (11th Cir. April 12, 2005) ("Unlike the situation in *Stewart*,[6] where the lack of objective findings formed the basis for the adverse credibility determination, the ALJ here relied on the inconsistencies between Moore's descriptions of her diverse

---

[6]*Stewart v. Apfel,* No. 99-6132, 2000 U.S.App. LEXIS 33214 (11th Cir. Dec. 20, 2000) (unpublished decision).

daily activities and her claims of infirmity.  More specifically, the ALJ questioned Moore's contentions that she could not maintain consciousness or perform light work, in light of her ability to drive, provide childcare, bathe and care for herself, exercise, and perform housework. . . . As the ALJ provided a detailed factual basis for his credibility determination [footnote omitted], which did not turn on the lack of objective evidence documenting fibromyalgia, *Stewart* is unavailing to Moore.")

*See, also, McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir.1986) ("'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work").

Here, as in *Moore,* the ALJ's decision did not turn on a lack of objective findings documenting fibromyalgia.  Rather, the ALJ recognized the impairment, but gave detailed, adequate reasons for concluding that Plaintiff's impairment was not sufficient severe to disable her from all work.  Those reasons are supported by substantial evidence in the record.

### CONCLUSION AND RECOMMENDATION

As the decision below was made in accordance with law and is supported by substantial evidence, it must be affirmed.  It is **respectfully recommended** that the decision be **AFFIRMED.** Should this recommendation be adopted by the District Court, the Clerk should enter judgment accordingly, terminate all pending matters, and close the case.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on July 5, 2005.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

-20-

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy